GRELLAS SHAH LLP
DHAIVAT H. SHAH, ESQ. (SBN 196382)
(ds@grellas.com)
DAVID I. SIEGEL, ESQ. (SBN 264247)
(dsiegel@grellas.com)
SETH K. KUGLER, ESQ. (SBN 304668)
(skugler@grellas.com)
550 California Street, Suite 1040
San Francisco, CA  94104
Telephone: (408) 255-6310
Facsimile: (408) 255-6350

Attorneys for Plaintiff CAPCONVERT, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPCONVERT, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>BENJAMIN BROWN, an individual, SIGNYL LLC, a New York limited liability company, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

Plaintiff Capconvert, LLC ("Capconvert" or the "Company") brings this action against Benjamin Brown ("Brown") and Signyl LLC ("Signyl," and with Brown, "Defendants") and alleges as follows:

### INTRODUCTION

1.     Capconvert brings this action to permanently enjoin Brown and Signyl from continuing to use or disseminate Capconvert's trade secrets and other confidential information which Brown, on behalf of himself and as an agent of Signyl, unlawfully misappropriated just before he resigned from Capconvert.  Capconvert also seeks to permanently enjoin Brown and Signyl's false advertising campaign to mislead consumers into believing that Signyl is an established company with a long and successful track record similar to Capconvert's.

2.     Capconvert is a young company providing search engine optimization ("SEO"), generative engine optimization ("GEO") and answer engine optimization ("AEO") services and Google Ads, Microsoft Ads, and Amazon Ads management services to businesses. Capconvert has developed proprietary processes and workflows that increase the company's efficiency and efficacy compared to other SEO, GEO and AEO providers and allow Capconvert to offer more competitive pricing.

3.     Jacque Loewy ("Loewy") founded Capconvert in 2019 and converted it to a single-member California limited liability company on January 4, 2021.

4.     Brown joined Capconvert in July 2025 and was given the title of "Partner" in or around September 2025.

5.     Brown had no prior professional experience in software development, machine learning, data science, SEO, GEO, paid media management, or technical marketing.  Loewy provided Brown with foundational training in these areas and in Capconvert's proprietary processes and technology.

6.     Brown began making cryptic statements to Loewy and others on January 26, 2026, regarding projects he was working on.  Additional statements and actions over the next few weeks led Capconvert to suspect that Brown, while still a Capconvert employee, had

misappropriated Capconvert's intellectual property to develop a product that competes with Capconvert's core services, including but not limited to SEO, GEO and paid ads management.

7. On February 22, 2026, Capconvert implemented protective access restrictions to prevent Brown from further accessing Capconvert's computer systems and sent Brown a Notice of Material Breach and Intent to Terminate. Brown immediately resigned upon receiving the notice.

8. Capconvert began a comprehensive review and audit of all Company-owned systems, accounts, and logs to which Brown had access during his employment. Capconvert's investigation remains ongoing, but the evidence obtained to date confirms Brown's extensive misappropriation of Capconvert's trade secrets and confidential information. Capconvert also determined that Brown had used Capconvert's trade secrets and confidential business information to create Signyl, a company that directly competes with Capconvert.

9. Capconvert demanded that Brown (1) cease and desist from operating Signyl because it was created from Capconvert's misappropriated trade secrets; (2) return any devices, documents or other materials in his possession that are the property of Capconvert; and (3) produce his personal electronic devices to Capconvert's counsel so they could be imaged and subject to forensic inspection by a certified forensic discovery vendor to identify and permanently delete any Capconvert material. Brown refused.

10. This lawsuit follows Capconvert's discovery of Brown and Signyl's extensive acts of theft and refusal to return and cease using Capconvert's trade secrets and confidential business information.

## **PARTIES**

11. Capconvert is a limited liability company organized under the laws of the State of California. Capconvert has a principal place of business at 401 Harrison Street, San Francisco, CA 94105. Capconvert is a provider of SEO, GEO and AEO services and Google Ads, Microsoft Ads, and Amazon Ads Management services to businesses.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

2
COMPLAINT

12.     Brown is an individual and, on information and belief, is a resident of New York, New York.  Brown was an employee of Capconvert holding the title of "Partner" until his resignation on February 22, 2026.

13.     Signyl is a limited liability company organized under the laws of the State of New York.  Signyl has identified Brown as the person to whom service of process should be provided.  On information and belief, Signyl is a member-managed limited liability company, and Brown is the sole member of Signyl.  On information and belief, Signyl is a provider of SEO, GEO and AEO services to businesses.

14.     Capconvert is ignorant of the true names and capacities, whether individual, corporate or otherwise, of defendants named herein as Does 1 through 10 ("Doe Defendants").  Capconvert sues said defendants by their fictitious names.  Capconvert will seek leave to amend this Complaint to assert allegations against the Doe Defendants when their true involvement in these matters and capacities are ascertained.  Capconvert is informed and believes, and on that basis alleges, that each of the defendants sued herein as Does 1 through 10 inclusive, is in some way legally responsible and liable to Capconvert with respect to the matters set forth herein.

### JURISDICTION

15.     This action arises under 18 U.S.C. § 1836, *et seq.* (the "Defend Trade Secrets Act"), 18 U.S.C. § 1030 (the "Computer Fraud and Abuse Act" or "CFAA") and 15 U.S.C. § 1125(a) (the "Lanham Act").  This Court has subject matter jurisdiction over the Defend Trade Secrets Act, CFAA and Lanham Act claims under 28 U.S.C. § 1331.  Supplemental jurisdiction over the state law claims is appropriate under principles of supplemental jurisdiction, 28 U.S.C. § 1367.

16.     The Court has personal jurisdiction over Brown because Brown purposefully availed himself of the privilege of conducting activities in California through his employment with Capconvert and by taking the actions alleged herein while present in California, the claims arise from Brown's jurisdictional contacts in California, and the injuries caused by Brown's misappropriation and other wrongs will be experienced in California.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

17.     The Court has personal jurisdiction over Signyl because Signyl purposely availed itself of the privilege of conducting activities in California by seeking to cultivate a nationwide audience for its services, including clients in California, and by having its agent, Brown, take the actions alleged herein in California and direct such actions towards a California company.  Capconvert's claims arise from Signyl's jurisdictional contacts with California, and the injuries caused by Signyl's wrongdoing will be experienced in California.

## VENUE

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Capconvert's claims occurred in this district, and a substantial part of the property that is the subject of Capconvert's claims is located in this district.

## DIVISIONAL ASSIGNMENT

19.     Assignment to either the San Francisco or Oakland Division is proper because a substantial part of the events or omissions giving rise to Capconvert's claims occurred in San Francisco County, and a substantial part of the property that is the subject of Capconvert's claims is situated in San Francisco County.

## BACKGROUND

**A.     Loewy Founds Capconvert And Develops Its Technology**

20.     Loewy founded Capconvert in 2019 and organized it as a single-member California limited liability company on January 4, 2021.  At the time of Capconvert's organization, Loewy was living in Sausalito, California.  Capconvert has always been based in the state of California.

21.     Through Capconvert, Loewy has delivered over 90,000 hours of search marketing services, including SEO, GEO, and Ad Management services to 300+ clients in North America, Europe, Australia, and Asia.  Prior to Brown joining Capconvert, Loewy scaled the business from a one-man operation to seven-figure annual profit margins.  Capconvert's clients include publicly-traded corporations, celebrity brands, online brands, and brick-and-mortar businesses.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

4
COMPLAINT

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

22. Loewy led Capconvert's development of proprietary processes, workflows and methodologies that standardized downstream SEO, GEO and AEO services to allow the Company to provide the highest quality advice using more junior employees. Because these employees are more cost-effective, Capconvert has created a scalable model that allows the Company to provide superior services at lower prices than its competitors. These proprietary processes and workflows are based in large part on strategic conclusions drawn by Capconvert using data amassed from servicing hundreds of businesses across seven years, to engage in pattern-recognition, benchmarking, and performance comparisons across industries, audience types, spend levels, and market conditions. Capconvert is an elite player in the SEO, GEO, and AEO industries yet is among the lowest priced providers of these services. Other lower-cost SEO, GEO and AEO providers typically start at $5000/month. Capconvert typically charges $2900-$4500/month depending on individual client needs and objectives. Capconvert, however, has not had to sacrifice any quality to outprice its competitors because its proprietary processes, workflows and methodologies ensure the highest quality advice.

23. Capconvert's track record reflects excellent results and high customer satisfaction. Capconvert's clients see an approximately 50% cost-per-acquisition ("CPA") reduction and an approximately 90% organic traffic lift. 100% of Capconvert's new clients come to Capconvert from referrals from Capconvert's existing clients. New clients seek out Capconvert because of its reputation for producing high quality results at lower prices than its competitors. This speaks to the quality and importance of Capconvert's proprietary methodologies.

24. Brown reached out to Loewy in or around May 2025 about joining Capconvert. Brown and Loewy had no prior relationship. Brown indicated that he was currently working for Google. His professional experience appeared to be in sales. He did not appear to have any software development, machine learning, data science, SEO, GEO, paid media management, or technical marketing experience, but claimed to have been on an "elite" team that created certain forecasting and modeling tools related to Google Ads. Brown was very persistent and eager about joining Capconvert. Loewy was hesitant to hire someone with no relevant experience for

a senior role, but he needed a business partner to scale back his frequently 16+ hour workdays. Loewy agreed to hire him. Though Brown lacked relevant experience or expertise, Loewy believed Brown's enthusiasm for the Company and professed commitment to helping the Company grow would be a benefit for the Company.

25. Brown joined Capconvert on or about July 26, 2025. He subsequently executed a Restricted Stock Agreement (the "Agreement") on or about September 1, 2025, and was given the title "Partner."

26. The language of the Agreement granted Brown quarterly income disbursements based on Capconvert's performance.

27. Brown was paid regular biweekly wages while employed by Capconvert.

28. Brown was hired to help build out Capconvert's business and needed access to all of Capconvert's systems and information to perform his job duties. Brown's job duties included building products to reduce Loewy's workload and further increase the Company's efficiency. Accordingly, after Brown officially joined Capconvert, Capconvert gave Brown access to all of its internal documents, client data, training materials, proprietary methodology, and other confidential business information.

29. Because Brown lacked any professional experience with software development, machine learning, data science, SEO, GEO, paid media management, or technical marketing, Loewy provided Brown with foundational training in these areas and in Capconvert's proprietary processes and technology throughout Brown's employment at Capconvert. Brown took extensive notes on the information Loewy provided him. Brown also took screenshots of demonstrations Loewy provided on how to perform Capconvert's core job functions.

30. During Brown's employment at Capconvert, Loewy and Brown had many strategy discussions regarding the unreleased Rankily product Loewy had developed, including what the product could and would do. Rankily is an SEO and GEO software powered by AI and systems automation. Rankily is essentially Capconvert, but automated. The Rankily.com website is owned and registered by Capconvert but has not been publicly launched. Brown had direct access to the Rankily deck and concepts in the course of his employment at Capconvert.

31. Based on Brown's expressed enthusiasm for Capconvert and Brown's interest in work Capconvert was doing, Capconvert believed Brown was committed to growing the Company and trusted him with the Company's confidential business information that he needed to perform his job duties.

**B.** **Brown Uses Capconvert Trade Secrets to Develop A Competitor Company And Product While Being Employed By Capconvert To Perform Similar Functions For Capconvert Itself**

32. In January 2026, Brown disclosed that he had created an automated tool that would perform Capconvert's workflows in providing services to its clients. The creation of the tool was directly within the scope of Brown's duties and was not itself a cause for alarm. But, as is further detailed below, Brown misappropriated this tool, and other trade secrets, to create a competitor company.

33. Brown disclosed that he had created this tool through a series of cryptic statements to Loewy on January 26, 2026. Initially, Brown sent Loewy Slack messages suggesting that he had automated the work performed by Loewy and his lieutenants in fulfilling services for Capconvert's clients, a feature he referred to as "a jacquebot." Brown had been hired to help grow Capconvert's business by alleviating the burden on Loewy, and an automated tool was consistent with Brown's job duties.

34. On January 27, 2026, during a Slack discussion about a client task, Brown stated that he had developed a bot that could automate the task. On information and belief, the referenced bot is a tool that replaces the human work Capconvert does in fulfilling services for its clients. This was also consistent with Brown's job duties of helping Capconvert grow by further increasing its efficiency.

35. On January 28, 2026, Brown sent Loewy Slack messages suggesting that he believed a large amount of computing power, all devoted to running AI agents could be connected to Capconvert's systems to perform some unstated function. It was unclear what these messages referenced at the time Brown sent them.

36. Subsequent messages and other communications Loewy and other Capconvert employees had with Brown led Capconvert to believe that Brown had developed a product that

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

7

competes with Capconvert's core services while he was still serving as an employee of Capconvert. This competition was in violation of Brown's duty of loyalty as a Capconvert employee.

37. Brown continually dropped hints that he was building something external to Capconvert, but when Loewy, as CEO of Capconvert, asked for additional information or to take a look at it, Brown would deflect. This came to a head over the weekend beginning on Friday, February 20, when Brown and Loewy spoke at about 6 p.m. During that conversation, Brown suggested that he wanted Loewy as an "advisor and mentor" and wanted Loewy to have a stake in Brown's new venture. Still though, Brown did not acknowledge the specifics of what he had built (including that it was a Capconvert competitor).

38. Following further discussion over the weekend, during which Brown suggested that Loewy sell Capconvert and join Brown's new venture, it became clear to Loewy that Brown had developed a Capconvert competitor while at Capconvert. On Sunday morning, February 22, Loewy shared this information with Capconvert's Chief Operating Officer, Melissa Ziegler, and Loewy and Ziegler cut off Brown's account access pending an investigation.

39. The Company implemented these protective access restrictions to prevent Brown from further accessing its computer systems on February 22, 2026.

40. After Capconvert revoked Brown's access to all company systems, Brown wrote to Loewy, "Interesting that you'd ask for details of my plan/product right before executing it." In that same communication, he also disclosed the existence of a personal OpenAI account that was accessible through or in connection with Company systems. Capconvert recognized that such an account would have been able to train on Capconvert's data for the benefit of Brown's "plan/product." Brown's reference to "my plan/product" cemented Capconvert's concerns that Brown had used Capconvert's resources, proprietary methodologies, client data, or confidential business information as training inputs in the development of an AI bot to be used in Brown's competing venture.

41. On February 22, 2026, after Brown made his disclosure, Capconvert sent Brown a Notice of Material Breach and Intent to Terminate (the "Notice").

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

8
COMPLAINT

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

42.    The Notice stated, among other things, that Capconvert believed Brown to be in material breach of the Agreement and his fiduciary duties to Capconvert by developing or engaging in activities that compete with, undermine, or divert opportunity from the Company during the term of his relationship with the Company.  In accordance with the terms of the Agreement, Capconvert provided Brown a 30-day cure period within which he could respond to the Notice.

43.    Brown resigned via text message on February 22, 2026, shortly after receiving the Notice.  Brown thereafter sent Capconvert a Mutual Separation and General Release Agreement (the "Separation Agreement") that he requested Capconvert sign.  The draft Separation Agreement included a covenant not to sue.  Capconvert has not signed and does not intend to sign the Separation Agreement.

**C.    Capconvert Discovers That Brown Misappropriated Its Trade Secrets And Confidential Information**

44.    After receiving Brown's resignation text message and proposed Separation Agreement, Capconvert began a comprehensive review and audit of all Company-owned systems, accounts, and logs to which Brown had access during his employment at Capconvert. This included review of the following:

a.    Brown's Slack workspace message history, including direct messages, channel communications, and any deleted or edited messages recoverable through the workspace's data retention policies;

b.    All Google Workspace activity, including Gmail, Google Drive, Google Docs, and any files created, accessed, modified, shared, or deleted;

c.    Any Company-paid tools, platforms, subscriptions, or systems used in the course of Brown's work at Capconvert.

45.    Capconvert's investigation remains ongoing, but the evidence obtained to date confirms Brown's extensive misappropriation of Capconvert's trade secrets and confidential information.  Brown has transferred, downloaded, redirected, or otherwise acquired significant

amounts of Capconvert's trade secrets, business information, and other confidential data into his personal control.

46. Capconvert uses Google Workspace to manage substantially all of its documentation, including its confidential training materials, operational documents, client onboarding and offboarding documents, client program plans and advertising strategies, client data, and client lists.

47. To protect the security of the Google Drive, Capconvert segregates materials and limits access only to those who need it for their role at Capconvert; uses password and multifactor authentication to control login access; and regularly monitors and reviews the Google Workspace audit trail.

48. These stolen trade secrets derive independent economic value from not being generally known to, nor readily ascertainable through proper means, by Capconvert's customers and competitors, and potential customers and competitors. This information is highly valuable to Capconvert and its competitors and could not easily be properly acquired or duplicated by others.

49. Capconvert generated an audit log of the activity on its Google Workspace to determine what actions Brown had taken (the "Google Workspace Audit Log").

50. The Google Workspace Audit Log revealed that Brown had made copies of and changed the permissions on at least 46 files in Capconvert's Google Drive to include the email address ben@signyl.agency – Brown's email address at his competitor company. This action caused Capconvert's confidential documents to be shared externally. Twelve of these documents were documents outlining the entire Signyl business plan. The remaining 34 documents were copies made of existing internal Capconvert company documents developed by Capconvert over the course of the previous four to seven years, based on Capconvert's internal knowledge development surrounding efficiency-maximization and mechanization of client delivery. The Signyl company documents repeatedly mentioned Brown as the sole human running the agency, indicating that they were not created as a tool to help Capconvert but as a separate competing business venture altogether

51.     The Google Workspace Audit Log also shows that on February 20, 2026, Brown shared at least 9 documents created by Loewy, including working documents that preceded Brown's joining Capconvert and new documents Loewy had made by compiling years of work and learning with clients as the company transitioned from primarily using ClickUp to Google Drive.  The first document shared externally, and one of the most egregious, was a document "P&C," which was a copy of Capconvert's "Processes and Communications" document.  It is a running document of workflows and situational scripts for client communications that was created by Loewy on January 25, 2025, well before Brown was onboarded.  The edit log shows that this running document, designed to record Capconvert's proprietary business processes, was predominantly drafted by Loewy.

52.     The Google Workspace Audit Log shows that beginning on February 3, 2026, and accelerating beginning February 15, 2026, Brown deleted 29 documents.  The deleted documents include Capconvert Profit & Loss statements, Capconvert Standard Operating Procedures (SOPs) documents, client onboarding and offboarding documents, client program plans and advertising strategies, internal documents evidencing Brown's use of Capconvert's systems to develop Signyl, Brown's notes and screenshots taken during the foundational training sessions Loewy had provided Brown, and a document titled "Capconvert Principles." "Capconvert Principles" is a collaborative document Loewy and Brown had worked on together during Brown's training to explain to Brown the basic principles of how Capconvert did business.  The Google Workspace Audit Log shows that Brown duplicated and deleted the document on February 20, 2026 – two days before his resignation.  Prior to February 3, 2026, Brown had never deleted any documents from Capconvert's Google Drive.

53.     The Google Workspace Audit Log also shows that Brown made an account registration change to the Google Workspace on February 20, 2026.  This change is consistent with Brown updating account recovery information in anticipation of a need to circumvent new access restriction. Earlier that same day, Loewy had asked Brown to take the day off due to his suspicious and insubordinate actions.

54. The Google Workspace Audit Log also showed that Brown had downloaded the file "Customer List - Google - m.ph - All Paying Customers - As of 1.19.26" on February 20, 2026. Brown downloaded this document the same day Loewy had instructed him to take the day off.

55. Capconvert's review of Brown's Capconvert email account shows that Brown used Capconvert's resources to build Signyl's infrastructure.

56. On January 26, 2026, Brown sent a test email to himself from an automated system, originating from an external API connected to his Capconvert Gmail account. Brown did this without authorization, disclosure, or permission from Capconvert. Brown had no authority to connect this external API into Capconvert's systems.

57. On January 27, 2026, Brown received an email from himself titled "Jarvis: Operational Check" stating: "Sir, this is a test to confirm my integration with your Gmail account. I am now fully operational and ready to assist with your agency's operations. Let me know when you receive this."

58. On January 31, 2026, a confirmation email from X (formerly Twitter) was delivered to Brown's Capconvert email confirming login to an account registered as @jarvisbot33. On information and belief, Brown created this account so that Brown's "JarvisBot" had access to post for "clients" on social media.

59. On February 2, 2026, Brown received two receipts from Anthropic, PBC for the "Max Plan 20X." On information and belief, Brown was using Anthropic's Claude AI assistant at maximum capacity during the period he was simultaneously an employee at Capconvert and building his competitor company. On information and belief, Brown's connection of this bot into Capconvert was to allow Brown to use Capconvert's proprietary information, methodology and client data as AI training-inputs in the development of his competing venture.

60. The Google Workspace Audit Log confirms that Brown synced Capconvert data across nine separate personal devices, none of which had been issued by the Company. These devices included multiple MacBook Air and Mac OS devices, a Windows B850 AORUS Elite

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

12
COMPLAINT

gaming PC added on February 12, 2026, and a new Mac OS device added on February 18, 2026 (four days before Brown's resignation).

61.     Brown's device expansion mirrors the statement he made on January 28, 2026, that "We should buy 100 mac minis and run agents on all of them to do everything."

62.     The Windows gaming PC is a high-performance desktop that can run AI agents at scale.  On information and belief, Brown used the Windows gaming PC to run and rapidly train large-scale AI agents that he built using Capconvert's trade secrets and confidential business information.

63.     Brown's emails also included artifacts of extensive outside Github activity. Brown had many email notifications from Github of failed run attempts that included "Signyl" in the name.  On information and belief, Brown was doing something in Github for Signyl rather than Capconvert while Brown was employed at Capconvert.

64.     On information and belief, Brown was setting up new infrastructure to access or extract Capconvert data in the final days of his tenure.

**D.     <u>Brown's Competing Company "Signyl" Is Built On Loewy's Rankily Concept And Capconvert's Trade Secrets And Confidential Information And Leverages Capconvert's Experience And Results As Signyl's Or Brown's</u>**

65.     Signyl was organized as a limited liability company under the laws of New York on February 8, 2026.  Brown is listed in the records of the New York Secretary of State as the person to whom service of process on Signyl should be delivered.

66.     Public records indicate that the domain "signyl.agency" was registered on February 7, 2026, and updated on February 12, 2026, when it became live and operational.  The website indicates that Signyl offers services directly replicating Capconvert's core offerings: SEO, GEO, Paid Media and CRO.  The website's tagline, "ML + Human Expertise," directly mirrors Loewy's unreleased Rankily product concept created exclusively by Loewy, but discussed with Brown (and which Brown had access to) as a Capconvert employee.

67.     Capconvert located a document on its Google Drive that Brown had created on February 16, 2026, titled "Signyl Knowledge Base Index v1.0."  This document contains complete SOPs, onboarding/offboarding procedures, growth programs, audit methodologies and

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

reporting templates. This document mirrors Capconvert's internal service delivery methodology, audit structures and operational SOPs. This document has multiple signals indicating it was generated by AI. On information and belief, it was created using the Capconvert Claude enterprise account using inputs of the internal Capconvert documents Brown stole. Within this document, there are directions for adding Google Drive links for multiple programs including Paid, SEO and GEO. These are the same programs listed in Capconvert's internal documents that were copied and shared externally by Brown. On February 20, 2026, alone, Brown downloaded 24 files, including confidential working client documents with data that could be used to train AI models.

68. Capconvert also located a document Brown had created for Signyl, while still employed by Capconvert, that was titled "Competitive Comparison." The document uses insider knowledge of Capconvert's business model, client insights, and operational approach. In this document, Brown explicitly claims credit for managing over $50 million in client ad spend across 200+ companies and a 96% client retention rate. Brown is claiming credit for managing all of Capconvert's past and present client base. Brown, however, only brought on one client during his 6-month tenure at Capconvert. This document also claims that Signyl has 10+ years of Senior Strategist experience. Based on information Brown provided to Capconvert, Brown was a college sophomore studying economics 10 years ago.

69. All Signyl documents were created in February 2026 over an approximately two-week period, indicating the entire competing venture was built during that brief period by an individual who had no previous professional experience in software development, machine learning, data science, SEO, GEO, paid media management, or technical marketing. This would have been impossible for Brown to create in a 2-week period without stealing and utilizing Capconvert's internal documents and over 5 years of compiled client data to train an AI bot.

70. Signyl purports to have 14 proprietary ML models built by Brown, including "BudgetOptimizer," "TrendAnalyzer," "AudienceSegmenter." On information and belief, these models were developed using Capconvert's internal documents, client examples, and internal training materials as inputs.

14
COMPLAINT

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

71. On March 5, 2026, during continual auditing, Capconvert discovered that one of Brown's devices was still syncing with the Capconvert Google Workspace. Upon further investigation, Capconvert determined that this was due to the many third-party applications Brown had granted access to without Capconvert's knowledge or permission. Capconvert documented via screenshots all of the third-party applications connected and then removed them for security reasons.

72. Capconvert noticed that several of these applications were granted access to Capconvert Google Docs **and** Google Ads. The names of these applications are very similar to products Signyl advertises having. For example, one third-party application is called "Trend Analysis," while Signyl boasts having an ML model called "TrendAnalyzer."

73. In the document titled "Signyl Knowledge Base Index v1.0" that Capconvert found on Capconvert's Google Drive, Brown states that Signyl's "Jarvis" bot is the foundation for Signyl. One of the third-party applications Brown granted access to is called "Jarvis 1." This application was granted incredibly broad access, including to Gmail (read and compose), Drive, Documents, Calendar, Contacts, Google Ads (AdWords), Analytics, Search Console, Spreadsheets, and Identity. This comprises Brown's entire Capconvert account. The application therefore had access to everything Brown formerly had access to, including client lists, emails, ad accounts, analytics, documents, and more. Notably, the access would have allowed for the following:

    a. Google Drive: Allows Brown's "Jarvis 1" to download Capconvert documents, spreadsheets and files and use them as training data.

    b. Gmail Access: Gives "Jarvis 1" email conversations, client communications, templates and writing styles.

    c. Analytics and Search Console Access: Gives "Jarvis 1" Capconvert performance data to train on.

    d. Google Ads: Provides "Jarvis 1" campaign data, targeting information and audience data.

    e. Google Sheets: Gives "Jarvis 1" structured data for training ML models.

74.     Brown appears to have connected eleven third-party applications that are either unidentified (appearing in Capconvert's review as "Unnamed Script") or have a name highly similar to Signyl's claimed ML models.   The majority of these third-party applications were given access on February 3 and 4, 2026.  This timing is consistent with Brown's registration of the signyl.agency domain name.  One week later on February 10, 2026, Brown connected "Signyl" to the Capconvert Workspace.

75.     Brown had no legitimate business purpose for connecting these applications to the Capconvert Workspace.  Capconvert reviewed Loewy's third-party authorized applications, and none of the applications Brown had granted access to was found.  These applications were not relevant to the normal operations within Capconvert.

76.     On information and belief, the only reason for Brown to have connected all of these third-party applications to Capconvert's Google Workspace is to utilize Capconvert's confidential and proprietary documents and data to train the ML models Signyl boasts having.

77.     The Signyl Knowledge Base mirrors Capconvert's internal service delivery methodology, audit structures and operational SOPs.

78.     Signyl's GEO Growth Program replicates Capconvert's newest, most specialized service offering.  This was a new offering that Capconvert had developed due to the evolving world of search marketing with AI.

79.     Signyl's Jarvis Client Intelligence Bot matches the JacqueBot that Brown boasted about in the Slack message he sent Loewy.  As discussed above, Capconvert discovered that Brown had granted a third-party application called "Jarvis 1" access to the entirety of Brown's Capconvert account, including to Gmail (read and compose), Drive, Documents, Calendar, Contacts, Google Ads (AdWords), Analytics, Search Console, Spreadsheets, and Identity.  This access would have allowed "Jarvis 1" to access Capconvert's confidential and proprietary files to be used as input to train AI models to perform the services Loewy provides to clients on behalf of Capconvert, *i.e.* to train a "JacqueBot."

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

80.     Signyl's software is described as SEO and GEO focused, AI powered, and automation driven – the same as the unreleased Rankily product concept that Loewy had developed and discussed with Brown.

81.     On information and belief, Brown misappropriated Capconvert's internal service delivery methodologies, internal training materials, audit methodologies and structures, operational SOPs, client data and history, client lists, onboarding/offboarding procedures, growth programs, and reporting templates, among other things, to build Signyl and its product.

**E.     Signyl And Brown Engage In False Advertising**

82.     The Signyl website also falsely represents its business history to mislead consumers into believing Signyl is an established company with an excellent track record – a company like Capconvert.

83.     A banner runs across the front page of Signyl.agency stating "200+ Brands Managed  $50M+ Ad spend optimized." These statistics cannot be true because Signyl has only existed for one month.  In some cases, these appear to be copies or slight variations of Capconvert's statistics, and in others they appear to have been just made up by Signyl and Brown.  "200+ Brands Managed" appears to be a variation of the "300+ Satisfied Clients" statistic on Capconvert's website.  Signyl could not have acquired more than 200 clients in one month.  This purported track record also cannot be attributed to Brown personally.  Brown had no relevant experience in the SEO industry prior to joining Capconvert and only brought in one client during his tenure at Capconvert.  Brown did not manage "200+ Brands" for Capconvert.  Nor did Brown optimize "$50M+ Ad spend" for Capconvert.

84.     Internal Signyl sales documents state "Ben - $50M+ in managed ad spend across 200+ brands."  As discussed above, these statistics cannot be attributed to Brown personally.  He had no relevant SEO experience before joining Capconvert and did not have $50M+ in managed ad spend across 200+ brands.  He brought in just one client

85.     The website touts performance metrics of 2.4× ROAS improvement, 41% CPA reduction, 87% organic traffic lift, and 96% client retention.  Brown and Signyl appear to have made up these metrics.  Signyl was launched just one month ago.  Moreover, Brown had no

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

experience in the SEO industry prior to joining Capconvert and did not achieve these metrics at Capconvert, so these metrics could not be attributed to Brown, either. 2.4× ROAS improvement, in particular, is dramatically outside the range of believable numbers for even the most successful and established industry players.

86.    A "Competitive Comparison" document claims cross-client intelligence derived from 200+ brands as a core Signyl differentiator.  This represents Capconvert's accumulated institutional knowledge, not Brown's or Signyl's.  On information and belief, any cross-client intelligence incorporated into Signyl's product was derived from Capconvert's trade secrets and confidential information.  Upon information and belief, Signyl has made the statements about cross-client intelligence reflected in this document to consumers and potential customers.

87.    Brown's LinkedIn profile falsely describes Brown as "Managing Partner" of Capconvert.  This misrepresents Brown's role and authority at Capconvert.  Brown was never the "Managing Partner" of Capconvert.

88.    Brown's LinkedIn profile also falsely includes the role "Operations – Rankily – Full-time – 2025-Present."  Rankily is an unreleased product created by Loewy.  Brown never worked for Rankily (no one but Loewy did) and had no role in its operations (there were none).  On information and belief, Brown included Rankily on his LinkedIn profile to falsely establish a connection to the project for the benefit of his own resume and the gravitas it would lend to his new company once Rankily was launched, given the similarities between the Signyl and Rankily concepts.

F.    **Brown and Signyl Remain In Possession Of Capconvert's Trade Secrets And Confidential Information**

89.    In the Notice that Capconvert sent to Brown on February 22, 2026, Capconvert demanded that Brown "[d]isclose in full the nature, scope, and current status of the competing venture, including any tools, systems, or methodologies developed, and confirm whether any of Capconvert's proprietary information, systems, methodologies, client data, or resources were used in its development."  Capconvert also demanded that Brown "return or destroy any Capconvert proprietary materials, methodologies, or data that may have been used in the

development of the competing venture." Brown did not comply with that demand and instead submitted his resignation.

90. Capconvert immediately retained legal counsel to assist in the recovery and protection of Capconvert's trade secrets and confidential information.

91. On February 24, 2026, Capconvert's counsel sent a letter to Brown's counsel, Andrew C. Palmer of Adibi IP Group, PC, demanding, among other things, that (1) Brown cease and desist from operating the Signyl company and using the signyl.agency website; (2) return any devices, documents or other materials in his possession that are the property of Capconvert; (3) produce his personal electronic devices to Capconvert's counsel so they could be imaged and subject to forensic inspection by a certified forensic discovery vendor to identify and permanently delete any Capconvert material; and (4) execute a separate agreement with Capconvert (a) certifying that all Capconvert confidential material in Brown's possession has been destroyed or returned; (b) outlining the known chain of custody for any further transfers of information following the downloads, or else certifying that he has not shown the information to anyone else or moved the information, in any way, from the initial device to which he downloaded it; (c) agreeing not to use any Capconvert confidential material for any purpose in the future; and (d) agreeing to provide any other reasonably necessary cooperation with Capconvert's ongoing investigation. Brown has refused to comply with any of these demands.

92. Brown's counsel has refused to engage in any meaningful discussion regarding the return of Capconvert's trade secrets and confidential information or Brown's cease of use of such materials. Instead, Brown has put forth a defense strategy in which his counsel studiously avoids calls with Capconvert counsel, while repeatedly setting forth vague offers of pseudo-"cooperation" that would stop Capconvert from suing while allowing Signyl to continue using the stolen Capconvert trade secrets.

93. Brown continues to use Capconvert's trade secrets and confidential information to compete with Capconvert. He continues to operate Signyl and the signyl.agency website to solicit clients for the product built on the trade secrets and confidential information he misappropriated from Capconvert. This presents extraordinary risk and harm to Capconvert.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

## FIRST COUNT

### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836

### [Against Brown and Signyl]

94.     Capconvert incorporates by reference each of the allegations in paragraphs 1 through 93 of this Complaint as though fully set forth here.

95.     The Trade Secrets include, but are not limited to: (a) the aggregation of data drawn from servicing hundreds of businesses across seven years, and (b) the strategic conclusions Capconvert drew by using that data for pattern-recognition, benchmarking, and performance comparisons across industries, audience types, spend levels, and market conditions, and (c) the proprietary processes, workflows, and methodologies drawn from those conclusions, which standardize downstream SEO, GEO and AEO services and are comprised of internal service delivery methodologies, internal training materials, audit methodologies and structures, operational and other SOPs, client data and history, client onboarding/offboarding procedures, and reporting templates; confidential strategic business information relating to growth programs; and Capconvert's client lists.

96.     The stolen Trade Secrets derive independent economic value from not being generally known to, nor readily ascertainable through proper means, by Capconvert's customers, competitors, and potential customers and competitors. This information is highly valuable to Capconvert and its competitors and could not easily be properly acquired or duplicated by others.

97.     Capconvert has invested significant time and resources into developing the Trade Secrets. Capconvert's Trade Secrets include at least seven years of analytics and strategic learnings. These learnings and data are not things that someone could simply research on their own without access to Capconvert's internal systems. They were developed through years of work on millions of dollars of ad spend. Capconvert's data, analytics, and strategic insights cannot be found, purchased, or replicated through any public source. Capconvert has developed processes, workflows and methodologies that allow it to more efficiently and effectively serve its clients. These Trade Secrets were developed through years of work and learning with clients.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

20
COMPLAINT

98.     Capconvert's proprietary processes, workflows and methodologies allow Capconvert to price its services more competitively than others. If Brown or Signyl were allowed to continue using Capconvert's trade secrets for their competitor company, or if the information Brown and Signyl misappropriated falls into the hands of a third party, particularly a competitor, that would provide them or such third party substantial competitive advantage as against Capconvert. If Capconvert's proprietary processes, workflows and methodologies were to continue being used by Brown and Signyl or become known to other companies in the SEO, GEO and AEO space, it would enable them to compete with Capconvert on pricing where they previously could not.

99.     The aggregation of data from over 250 businesses across seven years creates a pattern-recognition and benchmarking capability that is extraordinarily difficult to replicate. The strategic conclusions drawn from Capconvert's ability to compare performance across industries, audience types, spend levels, and market conditions is itself a trade secret of significant commercial value. The insights embedded in Capconvert's systems were derived from over $90 million in managed advertising spend across hundreds of campaigns. The patterns, learnings, and optimization strategies that emerge from that volume of real spend cannot be theorized or approximated — they can only be learned by actually deploying capital at scale, observing real market responses, and iterating over time. No competitor could replicate this knowledge base without independently (or via clients) spending a comparable sum and waiting a comparable number of years. Unlike general industry benchmarks or publicly available case studies, Capconvert's data reflects actual, identifiable, real world performance in response to various techniques. This includes conversion rates, cost-per-acquisition figures, audience segmentation strategies, creative performance data, and channel-specific analytics.

100.     Moreover, Signyl's current product is based on the unreleased Rankily product and was built using the other Trade Secrets they misappropriated from Capconvert. Brown built Signyl's "Jarvis Client Intelligence Bot" while employed by Capconvert using Capconvert's resources and Trade Secrets in the scope of his work for Capconvert.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

101.    Because this information has significant market value and is crucial to its success, Capconvert makes substantial efforts to keep this information confidential from its competitors. Capconvert requires employees to keep this information confidential and refrain from using it in any manner that might aid a competitor or potential competitor.

102.    Capconvert takes, and at all times here relevant has taken, reasonable efforts to maintain the secrecy of this confidential information it has developed. In particular, Capconvert has segregated materials and limits access only to those who need it for their role at Capconvert; uses password and multifactor authentication to control login access; and regularly monitors and reviews the Google Workspace audit trail. Only Loewy, Brown and Ziegler had access to the entire Google Drive based on their work for the Company. Other Capconvert employees have access only to the specific materials needed to fulfill their own individual job duties.

103.    The efforts Capconvert takes to keep this information confidential are reasonable under the circumstances to maintain its secrecy. Measures are taken to ensure the confidentiality of this information because it derives independent economic value from not being generally known to competitors or the general public who can obtain economic value from its disclosure or use. Because Capconvert's business is targeted at customers throughout the United States and internationally, the Company's Trade Secrets are intended for use as part of both interstate and foreign commerce. Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secrets Act.

104.    Brown, acting on behalf of himself and as an agent of Signyl, obtained access to and knowledge of the Trade Secrets as a Capconvert employee. Brown knew or had reason to know that his knowledge of the Trade Secrets was acquired under a circumstance giving rise to a duty to maintain the secrecy of that information or limit its use.

105.    Brown, on behalf of himself and as an agent of Signyl, misappropriated the Trade Secrets by transferring, downloading, redirecting, disclosing, using, or otherwise acquiring significant amounts of Capconvert's trade secrets, business information, and other confidential data into his personal control in the weeks before his resignation from Capconvert, knowing at

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

the time he accessed and used the data that he would be resigning or terminated shortly thereafter and would be prohibited from making any use of such data.

106. Each of Brown and Signyl's actions constitutes a misappropriation of trade secrets under the Defend Trade Secrets Act.

107. Each act of misappropriation was done willfully and maliciously by Brown and Signyl, thereby entitling Capconvert to exemplary damages and/or attorney's fees under 18 U.S.C. § 1836(b)(3)(C) and (D).

108. As a direct and proximate result of Brown and Signyl's use and continued possession of the Trade Secrets, Capconvert has suffered and will continue to suffer irreparable harm, unless restrained by order of this Court, for which damages will not afford adequate relief. Therefore, Capconvert seeks preliminary and permanent injunctive relief.

109. As a direct and proximate cause of Brown and Signyl's misappropriation of the Trade Secrets, Capconvert has suffered damages in an amount to be proven at trial.

## SECOND COUNT

### Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et. seq.*

### [Against Brown and Signyl]

110. Capconvert incorporates by reference each of the allegations in paragraphs 1 through 109 of this Complaint as though fully set forth here.

111. The Trade Secrets include, but are not limited to: (a) the aggregation of data drawn from servicing hundreds of businesses across seven years, and (b) the strategic conclusions Capconvert drew by using that data for pattern-recognition, benchmarking, and performance comparisons across industries, audience types, spend levels, and market conditions, and (c) the proprietary processes, workflows, and methodologies drawn from those conclusions, which standardize downstream SEO, GEO and AEO services and are comprised of internal service delivery methodologies, internal training materials, audit methodologies and structures, operational and other SOPs, client data and history, client onboarding/offboarding procedures, and reporting templates; confidential strategic business information relating to growth programs; and Capconvert's client lists

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

112.     The stolen Trade Secrets derive independent economic value from not being generally known to, nor readily ascertainable through proper means, by Capconvert's customers, competitors, and potential customers and competitors. This information is highly valuable to Capconvert and its competitors and could not easily be properly acquired or duplicated by others.

113.     Capconvert has invested significant time and resources into developing the Trade Secrets.  Capconvert's Trade Secrets include at least seven years of analytics and strategic learnings. These learnings and data are not things that someone could simply research on their own without access to Capconvert's internal systems. They were developed through years of work on millions of dollars of ad spend. Capconvert's data, analytics, and strategic insights cannot be found, purchased, or replicated through any public source. Capconvert has developed processes, workflows and methodologies that allow it to more efficiently and effectively serve its clients.  These Trade Secrets were developed through years of work and learning with clients.

114.     Capconvert's proprietary processes, workflows and methodologies allow Capconvert to price its services more competitively than others.  If Brown or Signyl were allowed to continue using Capconvert's trade secrets for their competitor company, or if the information Brown and Signyl misappropriated falls into the hands of a third party, particularly a competitor, that would provide them or such third party substantial competitive advantage as against Capconvert.  If Capconvert's proprietary processes, workflows and methodologies were to continue being used by Brown and Signyl or become known to other companies in the SEO, GEO and AEO space, it would enable them to compete with Capconvert on pricing where they previously could not.

115.     The aggregation of data from over 250 businesses across seven years creates a pattern-recognition and benchmarking capability that is extraordinarily difficult to replicate. The strategic conclusions drawn from Capconvert's ability to compare performance across industries, audience types, spend levels, and market conditions is itself a trade secret of significant commercial value. The insights embedded in Capconvert's systems were derived from over $90 million in managed advertising spend across hundreds of campaigns. The patterns, learnings, and optimization strategies that emerge from that volume of real spend

24
COMPLAINT

cannot be theorized or approximated — they can only be learned by actually deploying capital at scale, observing real market responses, and iterating over time. No competitor could replicate this knowledge base without independently (or via clients) spending a comparable sum and waiting a comparable number of years. Unlike general industry benchmarks or publicly available case studies, Capconvert's data reflects actual, identifiable, real world performance in response to various techniques. This includes conversion rates, cost-per-acquisition figures, audience segmentation strategies, creative performance data, and channel-specific analytics.

116. Moreover, Signyl's current product is built on the unreleased Rankily product concept that Brown and Signyl misappropriated from Capconvert using the other Trade Secrets they misappropriated from Capconvert. Brown built Signyl's "Jarvis Client Intelligence Bot" while employed by Capconvert using Capconvert's resources and trade secrets in the scope of his work for Capconvert.

117. Because this information has significant market value and is crucial to its success, Capconvert makes substantial efforts to keep this information confidential from its competitors. Capconvert requires employees to keep this information confidential and refrain from using it in any manner that might aid a competitor or potential competitor.

118. Capconvert takes, and at all times here relevant has taken, reasonable efforts to maintain the secrecy of this confidential information it has developed. In particular, Capconvert has segregated materials and limits access only to those who need it for their role at Capconvert; uses password and multifactor authentication to control login access; and regularly monitors and reviews the Google Workspace audit trail. Only Loewy, Brown and Ziegler had access to the entire Google Drive based on their work for the Company. Other Capconvert employees or contractors have access only to the specific materials they need to fulfill their individual job duties

119. The efforts Capconvert takes to keep this information confidential are reasonable under the circumstances to maintain its secrecy. Measures are taken to ensure the confidentiality of this information because it derives independent economic value from not being generally known to competitors or the general public who can obtain economic value from its disclosure

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

or use. Because Capconvert's business is targeted at customers throughout the United States and internationally, the Company's Trade Secrets are intended for use as part of both interstate and foreign commerce.

120.    Accordingly, the above-described information constitutes "trade secrets" under the California Uniform Trade Secrets Act.

121.    Brown, acting on behalf of himself and as an agent of Signyl, obtained access to and knowledge of the Trade Secrets as an employee of Capconvert.  Brown knew or had reason to know that his knowledge of the Trade Secrets was acquired under a circumstance giving rise to a duty to maintain the secrecy of that information or limit its use.

122.    Brown, on behalf of himself and as an agent of Signyl, misappropriated the Trade Secrets by transferring, downloading, redirecting, disclosing, using, or otherwise acquiring significant amounts of Capconvert's trade secrets, business information, and other confidential data into his personal control in the weeks before his resignation from Capconvert, knowing at the time he accessed and used the data that he would be resigning or terminated shortly thereafter and would be prohibited from making any use of such data.

123.    Brown and Signyl's actions constitute a misappropriation of trade secrets under California Uniform Trade Secrets Act ("CUTSA").

124.    Each act of misappropriation was done willfully and maliciously by Brown and Signyl, thereby entitling Capconvert to exemplary damages under Civil Code § 3426.3(c) and attorney's fees under Civil Code § 3426.4.

125.    As a direct and proximate cause of Brown and Signyl's misappropriation of the Trade Secrets, Capconvert has suffered damages in an amount to be proven at trial.

126.    Capconvert also seeks preliminary and permanent injunctive relief.

### THIRD COUNT

**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.***

**[Against Brown and Signyl]**

127.    Capconvert incorporates by reference each of the allegations in paragraphs 1 through 126 of this Complaint as though fully set forth here.

26
COMPLAINT

128. Capconvert's computers are used in or affecting interstate or foreign commerce or communication and are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2).

129. Brown intentionally accessed Capconvert's protected computers without authorization and thereby obtained information from Capconvert's protected computers, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

130. Brown knowingly, willfully and with the intent to defraud Capconvert, accessed Capconvert's protected computers without authorization or by exceeding authorized access to protected computers. In doing so, Brown furthered his intended fraud and obtained things of value, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

131. Brown intentionally accessed Capconvert's computer systems without authorization, and as a result of such conduct, recklessly caused damage, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(B).

132. Brown intentionally accessed Capconvert's computer systems without authorization, and as a result of such conduct, caused damage and loss, constituting a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

133. Signyl was organized as a limited liability company on February 8, 2026. After its organization, Signyl conspired with Brown to commit the offenses described above.

134. Capconvert has suffered damage and loss by reason of these violations, including, without limitation, (1) harm to its computer systems and data; (2) investigative and remedial time, labor and expenses; and (3) other losses and damage in an amount to be proved at trial, but in any event, in an amount well over $5,000 over a one-year period.

135. Capconvert also seeks recovery of its reasonable attorney's fees and costs.

136. Capconvert also seeks preliminary and permanent injunctive relief.

### FOURTH COUNT

### Violation of California Penal Code § 502(c) *et seq.*

### [Against Brown and Signyl]

137. Capconvert incorporates by reference each of the allegations in paragraphs 1 through 136 of this Complaint as though fully set forth here.

27

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

138. Brown intentionally accessed Capconvert's protected computers without authorization, constituting a violation of California Penal Code § 502(c).

139. Brown knowingly accessed and without permission altered, damaged, deleted, destroyed, or otherwise used Capconvert's data, computer, computer system, or computer network in order to defraud Capconvert and to wrongfully control or obtain Capconvert's property or data, constituting a violation of Penal Code § 502(c)(1).

140. Brown knowingly accessed and without permission took, copied, or made use of data from Capconvert's computer, computer system, or computer network, constituting a violation of Penal Code § 502(c)(2).

141. Brown knowingly and without permission used or caused to be used computer services, constituting a violation of Penal Code § 502(c)(3).

142. Brown knowingly accessed and without permission altered, damaged, deleted, or destroyed Capconvert's data, computer software, or computer programs which resided or existed internal or external to Capconvert's computer, computer system, or computer network, by deleting information from Capconvert's computer systems, constituting a violation of Penal Code § 502(c)(4).

143. Brown knowingly and without permission accessed Capconvert's computer, computer system or computer network, constituting a violation of Penal Code § 502(c)(7).

144. Signyl was organized as a limited liability company on February 8, 2026. After its organization, Signyl conspired with Brown to commit the offenses described above.

145. Capconvert has suffered damage and loss by reason of these violations, including, without limitation, (1) harm to its computer systems and data; (2) investigative and remedial time, labor and expenses; and (3) other losses and damage in an amount to be proved at trial.

146. Brown committed willful violations of Penal Code § 502(c) and acted with oppression, fraud or malice, entitling Capconvert to recover punitive or exemplary damages.

147. Capconvert also seeks recovery of its reasonable attorney's fees and costs.

148. Capconvert also seeks preliminary and permanent injunctive relief.

**FIFTH COUNT**

**False Advertising and Unfair Competition Under 15 U.S.C. § 1125(a)**

**[Against Brown and Signyl]**

149.    Capconvert incorporates by reference each of the allegations in paragraphs 1 through 148 of this Complaint as though fully set forth here.

150.    Brown's and Signyl's actions described above and specifically, without limiting, their misrepresentations on the signyl.agency website of Signyl's experience, results and institutional knowledge and Brown's misrepresentations in his LinkedIn profile of his role and responsibilities at Capconvert and purported role and responsibilities at Rankily constitute unfair competition and false advertising in violation of 15 U.S.C. § 1125(a).

151.    Consumers are likely to be misled and deceived by Brown's and Signyl's misrepresentations and material omissions, including their misrepresentations of their experience, results and institutional knowledge and Brown's misrepresentations of his role and responsibilities at Capconvert and purported role and responsibilities at Rankily.

152.    Brown and Signyl knew or should have known that their statements, omissions and conduct were likely to mislead.

153.    As an actual and proximate result of Brown's and Signyl's willful and intentional actions, Capconvert has suffered damages in an amount to be determined at trial, and unless Brown is enjoined, Capconvert will continue to suffer irreparable harm and damage to its business, reputation, and goodwill.

154.    Pursuant to 15 U.S.C. § 1117, Capconvert is entitled to damages for Brown and Signyl's Lanham Act violations and an accounting for profits made by Brown and Signyl and any other competitor company Brown is affiliated with, as well as recovery of the costs of this action.    Furthermore, Capconvert is informed and believes, and on that basis alleges, that Brown's and Signyl's conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Capconvert to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

## SIXTH COUNT

### False Advertising and Unfair Business Practices Under
### Cal. Bus. & Prof. Code § 17500 *et seq.*

### [Against Brown and Signyl]

155.    Capconvert incorporates by reference each of the allegations in paragraphs 1 through 154 of this Complaint as though fully set forth here.

156.    Brown's and Signyl's misrepresentations on the signyl.agency website of Signyl's experience, results and institutional knowledge and Brown's misrepresentations in his LinkedIn profile of his role and responsibilities at Capconvert and purported role and responsibilities at Rankily constitute unlawful, unfair or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising in violation of California Business and Professions Code § 17200 *et seq.*

157.    Consumers are likely to be misled and deceived by Brown's and Signyl's misrepresentations and material omissions, including their misrepresentations of Signyl's experience, results and institutional knowledge as Brown's own, along with Brown's misrepresentations of his role and responsibilities at Capconvert and purported role and responsibilities at Rankily.

158.    Brown and Signyl knew or should have known that their statements, omissions and conduct were likely to mislead.

159.    As an actual and proximate result of Brown's and Signyl's willful and intentional actions, Brown and Signyl have been improperly and unjustly enriched at Capconvert's expense for which Capconvert is entitled to restitution and disgorgement of Brown's and Signyl's ill-gotten profits.  The amount of such restitution and disgorgement shall be established according to proof at trial.

## SEVENTH COUNT

### Violation of Cal. Penal Code § 496

### [Against Brown and Signyl]

160.   Capconvert incorporates by reference each of the allegations in paragraphs 1 through 159 of this Complaint as though fully set forth here.

161.   California Penal Code § 496(a) prohibits a party from "receiv[ing]," "conceal[ing]," or "withhold[ing]" "any property" that has been "obtained in any manner constituting theft," knowing that the property was so obtained.

162.   California Penal Code § 496(c) provides a private civil right of action for any person who has suffered harm from a violation of the statute, entitling the victim to treble damages, attorneys' fees, and costs.

163.   Brown and Signyl have received and withheld property belonging to Capconvert in a manner constituting theft.

164.   Capconvert has been harmed as a result of Brown and Signyl's theft of inventions Brown built in the scope of his work for Capconvert, including the "JacqueBot" (rebranded by Signyl as "Jarvis Client Intelligence Bot").  Capconvert has also retained counsel and incurred costs to litigate this matter.

165.   As a direct and proximate result of Brown's and Signyl's violation of California Penal Code § 496, Capconvert has suffered damages in an amount to be proven at trial.

166.   Capconvert is entitled to treble damages, attorneys' fees, and costs as a result of Brown's and Signyl's violation of California Penal Code § 496.

## EIGHTH COUNT

### Breach of Duty of Loyalty and Breach of Fiduciary Duties

### [Against Brown]

167.   Capconvert incorporates by reference each of the allegations in paragraphs 1 through 166 of this Complaint as though fully set forth here.

168.   From July 26, 2025, through February 22, 2026, Brown was a Capconvert employee.  As a Capconvert employee, Brown owed it a duty of loyalty.

31
COMPLAINT

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

169.    Brown violated his duty of loyalty through numerous actions designed to facilitate competition with Capconvert while still serving as a Capconvert employee.

170.    Brown created and operated a company that competed directly with Capconvert while Brown was still an employee.

171.    Brown, also, throughout his relationship with Capconvert, failed to provide the requested services and provided services that were low quality and below the standard he represented to Capconvert that he was capable of providing. Brown favored his competitor company over his role at Brown and failed to commit a reasonable level of professional energy to Capconvert.

172.    As a result of Brown's breach of his duty of loyalty, Capconvert has sustained and will continue to sustain damages and injuries.

173.    Brown's actions and conduct as alleged herein were a substantial factor in causing Capconvert harm.

174.    Brown's acts, and each of them, were done with malice, oppression or fraud. As a result, Capconvert is entitled to an award of exemplary and punitive damages in an amount to be proven at trial.

175.    Additionally, as a direct and proximate result of Brown's breaches, Capconvert has suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Capconvert respectfully prays for judgment against Brown and Signyl and in Capconvert's favor as follows:

(1)  For general and special damages in an amount to be proven at trial;

(2)  For exemplary and punitive damages;

(3)  For restitution and disgorgement of profits;

(4)  For disgorgement of all monies and benefits receives from Capconvert during his period of disloyal conduct as a faithless servant;

(5)  For a declaration that Signyl's Jarvis Client Intelligence Bot was built by Brown in the scope of his work for Capconvert and belongs to Capconvert;

32

COMPLAINT

(6)  For treble damages;

(7)  For pre-judgment and post-judgment interest;

(8)  For reasonable attorney's fees, expenses and other costs of suit;

(9)  For preliminary and permanent injunctive relief and other equitable relief;

(10) For such other and further relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:  March 11, 2026          GRELLAS SHAH LLP

By:  /s/ Seth K. Kugler
     Seth K. Kugler, Esq.
     Attorneys for Plaintiff
     CAPCONVERT, LLC

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

33
COMPLAINT