IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPCONVERT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BENJAMIN BROWN, et al.,<br><br>Defendants. | Case No. 26-cv-02149-CRB<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>**REDACTED – PUBLIC VERSION** |

Plaintiff Capconvert, LLC brings suit against Defendants Benjamin Brown and Signyl LLC over Defendants' alleged misappropriation of Capconvert's trade secrets and confidential information for use in a competing business venture.  See Compl. (dkt. 1).  A temporary restraining order (TRO) is already in place.  See Order on Motion for TRO (dkt. 21); Stipulated and Modified Order Extending Order to Show Cause/Preliminary Injunction Schedule (dkt. 23).  Capconvert now moves for a preliminary injunction on the basis of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq., the Lanham Act, 15 U.S.C. § 1125(a), and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.  See App. (dkt. 5).  There is ample support for such an injunction.  Accordingly, as explained below, the Court GRANTS the motion.

I.      BACKGROUND

A.      Brown's Employment

Capconvert is a marketing company that provides businesses with search engine optimization ("SEO"), generative engine optimization ("GEO"), answer engine optimization ("AEO") and paid ad management services.  Loewy Decl. (dkt. 5-2) ¶ 5.

Jacque Loewy founded Capconvert in 2019. Id. ¶ 3. Capconvert hired Brown in July of 2025. Id. ¶ 13. He did not sign an NDA. Brown Decl. (dkt. 30-1) ¶ 16. Brown's title was "partner" and he was tasked with "creating new processes, improving systems, and otherwise finding ways" to reduce Loewy's workload and increase efficiency. Loewy Decl. ¶ 14. Brown had no previous experience with software development, data science, SEO, GEO, paid media management, or technical marketing, and so Loewy trained him in those areas and in Capconvert's processes and technology. Id. ¶ 15. Brown did have previous experience at Google, where his work included "digital advertising strategy paid media campaign management, measurement and attribution, growth consulting, performance analysis, and client-facing work" on platforms such as Google Ads. Brown Decl. ¶ 4.

While Brown was at Capconvert, he and Loewy had numerous conversations about an unreleased product called Rankily, which Loewy developed. Loewy Decl. ¶ 16.[1] Rankily is SEO and GEO software powered by AI and systems automation. Id. During his employment, Brown had "full access without restriction to everything" in Capconvert's system. Brown Decl. ¶ 31. Because "Capconvert did not provide [Brown] with any company-issued hardware," Brown did his work for the company on his personal devices. Id. ¶ 32.

In January of 2026, Brown disclosed to Loewy through a series of cryptic statements that he had created an automated tool that could perform Capconvert's workflows in providing services to clients. Loewy Decl. ¶ 18. Brown's creation of the tool was within the scope of his job duties and did not concern Loewy. Id. ¶¶ 18–19. Brown also referenced a "new bot" that could automate a client task. Id. ¶ 20. Then on January 28, Brown recommended buying "100 mac minis and run agents on all of them to do everything." Id. ¶ 21. Loewy noticed a decline in Brown's work performance. Id. ¶

---

[1] Brown does not contend that Capconvert has asserted that the Rankily concept is itself a trade secret. See Kugler Decl. ISO Reply (dkt. 32-4) Ex. A (hereinafter "Brown Depo.") at 285:6–8.

United States District Court
Northern District of California

23. Brown began "continually dropp[ing] hints that he was building something external to Capconvert." Id. ¶ 24. Indeed, Brown had begun working on such a venture, named Signyl, in early February 2026. Brown Decl. ¶ 37.[2]

On February 20, Brown suggested that he wanted Loewy as an "advisor and mentor" and wanted Loewy to have a stake in his new venture. Loewy Decl. ¶ 24. Brown said that Loewy should sell Capconvert and join Brown's new venture. Id. ¶ 25; see also Brown Decl. ¶ 54 (stating that this exchange occurred on February 21). On February 22, having concluded that Brown had developed a Capconvert competitor while still employed at Capconvert, Loewy spoke with Capconvert's COO, Melissa Ziegler. Id. They cut off Brown's access to Capconvert systems pending an investigation. Id. Loewy told Brown that he had suspended Brown's access but that Brown was not being fired. Brown Decl. ¶ 59. Brown contacted Loewy and said, "Interesting that you'd ask for details of my plan/product right before executing it." Loewy Decl. ¶ 27. Brown also disclosed the existence of an OpenAI account that was accessible through Capconvert's systems. Id.

That night, Capconvert sent Brown a Notice of Material Breach and Intent to Terminate. Id. ¶ 28. Brown resigned. Id. ¶ 30. Loewy responded that Brown should "go build [his] own thing" with his "own ideas" and "own ingenuity" and "[c]ompete in good faith." Brown Decl. ¶ 63.

### B.     Audit

Capconvert then did a "comprehensive review and audit of all Company-owned systems, accounts, and logs to which Brown had access during his employment." Loewy Decl. ¶ 31. Ziegler led the investigation. Ziegler Decl. (dkt. 5-3) ¶ 9. While the investigation is still ongoing, Capconvert contends that it has already yielded "evidence confirming Brown's extensive misappropriation of Capconvert's trade secrets and confidential information," including that "Brown has transferred, downloaded, redirected, or otherwise acquired significant amounts of Capconvert's trade secrets, business

---

[2] Brown asserts that "[t]he majority of Signyl build work was done after hours and on weekends, with AI coding agents running in the background during the day." Id. ¶ 43.

information, and other confidential data into his personal control." Id. ¶ 10. Results of the investigation include the following:

- Brown made copies of, and changed the permission on, at least 46 files in Capconvert's Google Drive to include the email ben@signyl.agency. This caused Capconvert's confidential documents to be shared externally. Of those 46 documents, 12 were documents outlining Signyl's business plan. Those documents reflect a competing business venture, and name Brown as the sole human running the agency. The remaining 34 were internal Capconvert company documents. Id. ¶ 12.

- On February 20, Brown shared at least 9 documents created by Loewy, including documents that preceded Brown's joining Capconvert. One was Capconvert's "Processes and Communications" document, a running document of workflows and scripts for client communications created in January of 2025. Id. ¶ 13.

- Brown deleted 29 documents, including Capconvert's profit and loss statements, standard operating procedure documents, client onboarding and offboarding documents, client program plans and advertising strategies, and documents showing Brown's use of Capconvert systems to develop Signyl. Prior to February 3, Brown had never deleted any documents from Capconvert's Google Drive. Id. ¶ 14.

- Brown made an account registration change to the Google Drive on February 20. Id. ¶ 15.

- On February 20, Brown downloaded the Capconvert customer list. Id. ¶ 16.

- On January 26, Brown sent himself a test email from an automated system titled "Jarvis: Operational Check." Id. ¶¶ 18–19.

- On February 2, Brown received two receipts from Anthropic suggesting that Brown was using Anthropic's Claude AI assistant at maximum capacity to use Capconvert's proprietary information as AI inputs in the development of Signyl. Id. ¶ 21.

- Brown synced Capconvert data across nine personal devices, none of which had been issued by Capconvert. Id. ¶ 22.

Ziegler also learned that "signyl.agency" was registered on February 7, and went live and operational on February 12. Id. ¶ 25. Signyl's website states that Signyl offers

4

the same services as Capconvert: SEO, GEO, Paid Media and CRO. Id. Ziegler believes that a document entitled "Signyl Knowledge Base Index v1.0" created on February 10 "was created using the Capconvert Claude enterprise account using inputs of the internal Capconvert documents Brown stole." Id. ¶ 26. Ziegler also discovered on Brown's Google Drive a document that Brown created for Signyl while still employed by Capconvert, called "Competitive Comparison," which "uses insider knowledge of Capconvert's business model, client insights, and operational approach." Id. ¶ 27. "[A]ll Signyl documents were created in February 2026 over an approximately two-week period, indicating the entire competing venture was built during that brief period by an individual who had no previous professional experience in software development, machine learning, data science, SEO, GEO, paid media management, or technical marketing." Id. ¶ 29.

On March 5, Ziegler saw that one of Brown's devices was still syncing with the Capconvert Google Workspace due to "the many third-party applications [Brown] had granted access to without Capconvert's knowledge or permission." Id. ¶ 32. The names of Brown's applications were very similar to products that Signyl advertises having. Id. ¶ 33. That includes the "Jarvis" bot that Brown states is the foundation for Signyl on the "Signyl Knowledge Base Index v1.0" document. Id. ¶ 34. Brown granted the "Jarvis 1" third-party application to Capconvert's Gmail, Drive, Documents, Calendar, Contacts, GoogleAds, Analytics, Search Console, Spreadsheets, and Identity—"Brown's entire Capconvert account." Id.[3] Capconvert demanded that Brown return all Capconvert proprietary materials "that may have been used in the development of the competing venture" and Brown refused. Id. ¶¶ 47–49.

### C.    Brown Statements and Admissions Post-TRO

Following the Court's grant of a TRO, Brown submitted a declaration in support of his opposition to Capconvert's motion for a preliminary injunction. See Brown Decl. The

---

[3] Ziegler notes that "Based on the fact that these applications were still connected as of March 5, 2026, they would have been connected even as Brown was implying through counsel that he should be able to continue running his business because it was entirely separate from Capconvert." Id. ¶ 38.

declaration includes a series of passive statements as to how he developed Signyl. See, e.g., id. ¶ 38 ("The domain signyl.agency was registered"), ¶ 39 ("Signyl's GitHub repositories were created"), ¶ 40 ("Signyl's ML platform was built"), ¶ 43 ("The majority of Signyl build work was done"). Brown declares that "Since February 22, 2026, I have not used Capconvert internal documents, code, or client data to build or operate Signyl," id. ¶ 75, leaving open the possibility that he did use Capconvert materials prior to February 22.[4] Ultimately, he states that he "did not train any AI systems on Capconvert materials." Id. ¶ 76.

The day after Defendants filed their opposition to Capconvert's motion, Capconvert took Brown's deposition.[5] At that deposition, Brown made a series of admissions. He admitted that he transferred the files from Capconvert to Signyl that are listed in Capconvert's audit log. Brown Depo. Tr. at 54:13–17[6]; see also id. at 235:20–236:13 (describing drive migration request stating "Ben wants to copy specific doc/sheets from Capconvert drive to Signyl.agency drive" and flow of "Copy as Capconvert, share with Signyl.agency, copy from Signyl side, delete intermediate"), id. at 236:22–24 ("What I do recall is probably stating the intent to just copy documents from Capconvert over to Signyl."). Some of these documents "reflected internal processes and procedures at

---

[4] See also Opp'n at 16 ("Brown states that he has not used Capconvert documents, code, or client data to build or operate Signyl since February 22, 2026").

[5] Capconvert filed excerpts of Brown's deposition, and the Court allowed it to file some of that testimony under seal. See Kugler Decl. ISO Reply Ex. A (dkt. 32-4) (hereinafter "Brown Depo. Tr."); Order Re Admin. Mot. (dkt. 36). The Court redacts any under-seal material quoted in the publicly-available version of this order.

[6] Brown testified that those documents included the Capconvert standard operating procedures document and Capconvert's optimizations document, id. at 146:11–18, 154:14–17, a document called "Ben/Jacque's strategy," id. at 154:18–25, a "Capconvert principles" document, id. at ██████ " id. at 157:19–23, ███████ ████ , a document called ██████ es," id. at 159:25–160:1, a document called "Capconvert UE calculator template, id. at 160:2–4, a document called "STR template," id. at 160:8–9, a document called "checklists," id. at 161:4–5, a "copy of form optimization template," id. at 161:10–11, a "copy of coms," id. at 163:20–21, a "copy of draft snap audit," id. at 163:22–23, a "copy of published blog posts," id. at 163:24–25, a "copy of checks," id. at 164:1–2, a "copy of processes and coms," id. at 3–4, and a "copy of keyword planner cleanings," id. at 164:5–6.

Capconvert." Id. at 178:21–24; see also id. at 184:8–9 ("Capconvert internal processes").

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████ .[7] He admitted that those transferred Capconvert files are in areas that the Signyl AI has access to. Id. at 54:18–19. He also admitted that he instructed AI to "delete Capconvert copies after recreating" the documents. Id. at 203:22–204:1. Brown claimed that he shared copies of Capconvert documents with his Signyl account because he "wanted a historical record of the documents." Id. at 146:2–6, 149:11–15. He stated that the only reason he had not taken documents that he worked on while he was at Google when he left Google was that Google blocked his access to the documents upon his resignation. Id. at 149:16–150:7. When counsel remarked that Capconvert blocked Brown's access to Capconvert as soon as he resigned, but that Brown "had already made sure to get the documents so that [he'd] have the record," Brown agreed. Id. at 150:14–21.

Brown also admitted that some of Capconvert's data was in Signyl's memory folder for the machine learning (ML) models on his computer. Id. at 257:15–259:22. He admitted that ████████████████████████████████████████████ ███████████████████████, and that such files remained available to Signyl's AI agents, which have access to everything in the OpenClaw and Claude memory folders.[8] Id. at ████████, 254:5–13, 256:11–257:14, 291:15–292:24. Brown testified that if the

_____

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

AI agents determine that it would be helpful to access the materials to respond to a prompt, they could access those folders. Id. at 257:12–14. ███████████████ ████████████████████████████████████████████ ███████████████████████ Brown stated that he did not shut the OpenClaw folder off to his Signyl agents when he left Capconvert. Id. at 265:9–12. And he continued to run OpenClaw for Signyl for nearly three weeks after leaving Capconvert. Id. at 265:13–19. Although Brown testified that he has now stopped using OpenClaw, he testified that the Claude AI agent that he continues to use for Signyl has access to all OpenClaw folders and can use the documents in those folders if it believes the material is "useful for answering a prompt." Id. at 240:14–17, 291:15–292:24.

Moreover, although the opposition brief touts Brown's efforts to quarantine Capconvert's materials, see, e.g., Opp'n (dkt. 30) at 13, see also Brown Depo. Tr. at 42:8–15 (describing quarantine), Brown's MacBook Air contained a document stating "This is the most important rule you have. You violated it on February 26th, 2026, and it nearly destroyed Ben's career," Brown Depo. Tr. at 40:14–24. Brown explained that he intended for the statement to make it "abundantly clear to any agent that I was working with . . . to not access any Capconvert . . . file." Id. at 41:12–15. Asked whether the statement meant that "a bot accidentally [made] an incursion into Capconvert systems on February 26th," Brown testified that "a second bot disputed" that any incursion had happened. Id. at 47:22–48:15.

### D.    LinkedIn Page and Website Representations

Brown's LinkedIn page describes him as "Managing Partner" of Capconvert, though that was never his role or title. Loewy Decl. ¶ 39; Ziegler Decl. ¶ 28. It states that he worked on Capconvert's Rankily product, but he did not. Loewy Decl. ¶ 40. The Signyl website states "200+ Brands managed $50M+ Ad spend optimized," which cannot be true as Signyl has only existed for one month. Id. ¶ 37. Brown had no relevant experience in SEO prior to his time at Capconvert, and while there, only brought in one client. Id. He did not manage 200+ Brands or optimize a "$500M+ Ad spend." Id. The

United States District Court
Northern District of California

Signyl website also appears to misrepresent Signyl's performance metrics.  Id. ¶ 38.

Brown responds that "the metrics displayed on that site did not relate to Capconvert work" but were "derived from my work predating Capconvert."  Brown Decl. ¶ 83.  He further asserts that "any public statements I made about my experience were intended to refer to my own prior professional background and track record at Google."  Id. ¶ 85.

### E.    Procedural History

Capconvert attempted to resolve its dispute with Brown without litigation, but those efforts failed.  See Kugler Decl. (dkt. 5-4) ¶¶ 3–4.  Brown and his counsel represent that once the dispute with Capconvert "escalated," Brown started preserving and segregating "materials that might later be claimed by" Capconvert, and that he informed Capconvert of that fact.  Brown Decl. ISO Opp'n to TRO (dkt. 15-1) ¶¶ 11–12; Palmer Decl. (dkt. 15-2) ¶ 5.  Capconvert brought suit on March 11, alleging: (1) violation of the DTSA; (2) violation of the UTSA; (3) violation of the Computer Fraud and Abuse Act; (4) violation of California Penal Code § 502(c); (5) False Advertising and Unfair Competition Under 15 U.S.C. § 1125(a); (6) False Advertising and Unfair Business Practices Under Cal. Bus. and & Prof. Code § 17500; (7) violation of Cal. Penal Code § 496; and (8) breach of the duty of loyalty and breach of fiduciary duties.  See Compl.

Capconvert applied for a TRO on the same day based on its DTSA and CUTSA claims and its false advertising claims.  See App.  Chief Judge Seeborg held a hearing on Monday, March 16, 2026, see Motion Hearing (dkt. 17), and granted a TRO the following day by way of a proposed order submitted by the parties, see Order on Motion for TRO.  In sum, the TRO enjoined Defendants from using any documents transferred from Capconvert's system, enjoined Defendants from using any bots developed with any Capconvert documents, required Defendants to return to Capconvert hard copies of any Capconvert documents in its possession, granted limited, expedited discovery, and instructed the parties to engage a forensic analyst.  Id. at 1–2.  Judge Seeborg also set out a briefing schedule for a preliminary injunction motion.  Id. at 2.  Defendants opposed the

United States District Court
Northern District of California

motion, see Opp'n, and Capconvert replied, see Reply (dkt. 32-3).[9]  Because Capconvert's reply brief cited to testimony from Brown's deposition, which took place after Defendants filed their opposition brief, the Court allowed Defendants to file a sur-reply brief.  See Order Granting Ex Parte App. (dkt. 39); Sur-Reply (dkt. 37-2).  Defendants also filed an Objection to the new evidence cited in the reply brief, see Objection (dkt. 38), which the Court DENIES as lacking in merit, particularly given Defendants' opportunity to file a sur-reply.  On May 22, 2026, the Court held a motion hearing in this case and then entered a preliminary injunction, stating that it would provide its reasoning in a separate document.  See Motion Hearing on MPI (dkt. 49); Injunction (dkt. 50).  This order provides that reasoning.

## II.    LEGAL STANDARD

A party seeking injunctive relief must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for temporary restraining order the same as for preliminary injunction).  Alternatively, if the party demonstrates that "the balance of hardships tips sharply in [its] favor," it need only show that "serious questions going to the merits were raised" and that the other two Winter elements are satisfied.  All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citation omitted).  Either way, success on the merits "is the most important Winter factor."  Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted).

## III.   DISCUSSION

Capconvert argues that it satisfies all of the Winter factors and is therefore entitled to injunctive relief.  The Court agrees.

---

[9] The Court permitted Capconvert to file parts of its reply brief under seal.  See id.; Order Re Admin. Mot.  The Court redacts any under-seal material quoted in the publicly filed version of this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

### A.      Likelihood of Success on the Merits

The likelihood of success on even one claim is sufficient as long as that claim would support the injunctive relief sought.  See Dowl v. Williams, No. 13-cv-119-HRH, 2018 WL 2392498, at *1 (D. Alaska May 25, 2018) ("A plaintiff need not establish that he is likely to succeed on the merits of all his claims.  A . . . preliminary injunction may issue if a plaintiff can show he is likely to succeed on one claim and that he meets the other three requirements for injunctive relief.") (emphasis in original) (citing League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 766 n.3 (9th Cir. 2014)).  Capconvert argues that it is likely to succeed on (1) the DTSA and CUTSA claims and (2) the false advertising claims.  See App.

### 1.      DTSA and CUTSA Claims

The standards for analyzing DTSA and CUTSA claims are substantially the same.  Both require a plaintiff to demonstrate: (a) that the plaintiff possesses a trade secret, (b) that the defendant misappropriated the trade secret; and (c) that the misappropriation caused or threatened damage to the plaintiff.  See InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 657–58 (9th Cir. 2020).  Capconvert is likely to succeed in meeting this standard.

### a.      Trade Secrets

A trade secret is "information that (1) derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable by other people who can obtain economic value from its disclosure or use and (2) is subject to reasonable efforts to maintain its secrecy." WeRide Corp. v. Kun Huang, 379 F. Supp. 3d 834, 845–46 (N.D. Cal. 2019), modified in part, No. 5:18-cv-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 6, 2019).  A plaintiff must identify an alleged trade secret "with reasonable particularity 'to limit the permissible scope of discovery by distinguishing the trade secrets from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade.'" Id. (quoting Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal. App. 4th 826, 835 (2005)).

### i.    Trade Secrets

Capconvert alleges that Brown stole trade secrets consisting of the aggregation of data drawn from servicing hundreds of clients over seven years, the strategic conclusions that Capconvert drew by using that data for pattern recognition, benchmarking, and performance comparisons, and the proprietary processes, workflows, and methodologies that Capconvert uses in its SEO, GEO, and AEO services.  App. at 15; Loewy Decl. ¶ 41.  It also alleges that Brown stole confidential information about Capconvert's growth programs and client lists.  App. at 15 (citing SolarPark Korea Co. v. Solaria Corp., No. 23-cv-1191-AMO, 2023 WL 4983159, at *4 (N.D. Cal. Aug. 2, 2023) (documents re technical know-how and process improvements are protectable as trade secrets); Henry Schein, Inc. v. Cook, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets"); Arthur J. Gallagher & Co. v. Tarantino, 498 F. Supp. 3d 1155, 1172 (N.D. Cal. 2020) ("client contact information and client policy information" are trade secrets)).

Defendants argue that Capconvert has failed to specify which documents are trade secrets.  See Opp'n to TRO (dkt. 15) at 5 ("the alleged trade secrets remain unidentified"), 6 (arguing that Capconvert refused to identify which information is a trade secret, versus confidential, versus proprietary); id. ("[n]ot every internal document is a trade secret"); Opp'n at 10 ("[a] preliminary injunction cannot rest on an undefined cloud of internal business information"), 11 ("Plaintiff cannot convert general technical skill or development ability into a trade secret.").  This is incorrect.

While Capconvert broadly identified categories of documents, see Loewy Decl. ¶¶ 41–43, it also identified specific documents within those categories.  See, e.g., Ziegler Decl. ¶ 13 (one document is "Processes and Communications," a running document of workflows and scripts for client communications created in January of 2025), ¶ 14 (one document is Capconvert's Standard Operating Procedures, another is "Capconvert Principles"), ¶ 16 ("Customer List – Google – m.ph – All Paying Customers – As of 1.19.26" document).  Capconvert adds that it "must use categories to describe its trade

United States District Court
Northern District of California

secrets because the full extent of Brown's and Signyl's misappropriation of materials containing Capconvert's trade secrets is not yet known." Reply at 5.[10] That is a reasonable assertion. For now, it is enough that Brown agreed that the documents he transferred to Signyl from Capconvert contained confidential, non-public information, reflected Capconvert's internal methods, and could not have been accessed outside of his Capconvert employment, Brown Depo. Tr. at 176:20–184.24, and that the ███████████ ████████████████████████████████████████████████████████████ ████████████ and Capconvert work that he could not have obtained outside of his work at Capconvert, id. at 260:16–263:6, 264:10–268:18.

Certainly some of the documents that Capconvert specified in its filings consist of trade secrets. See, e.g., Arthur J. Gallagher, 498 F. Supp. 3d at 1172 (customer lists).

### ii.    Value From Not Being Known

Capconvert also alleges that those materials derive independent value from not being known. App. at 15–16. Loewy explains that Capconvert invested "time, energy, and resources" in developing "its proprietary methodologies and other trade secrets" and that it would be "immensely harmful" for those secrets to be known to Capconvert's competitors, as "Capconvert's competitive advantage lies in the processes, workflows and methodologies that it has developed that allow it to more efficiently and effectively serve its clients and thus price its products more competitively than others." Loewy Decl. ¶ 43. Loewy declares that Capconvert operates in a highly competitive market and that "its proprietary processes, workflows and methodologies" are what enable it to compete, delivering excellent results at lower prices. Id. He adds that misappropriation of those trade secrets would be "devastating . . . particularly in the hands of someone who already has relationships with many Capconvert clients." Id.

Capconvert has adequately demonstrated that its trade secrets derive value from not being known.

---

[10] It adds that until its expert has been able to review all of Brown's and Signyl's devices, its injunction cannot be limited to the already-specified documents. Id.

### iii.  Efforts to Protect

Capconvert also alleges that it has made reasonable efforts to protect its secrets. See App. at 16–17; Loewy Decl. ¶ 44 ("Capconvert takes many steps, measures and precautions to protect its valuable trade secrets").  Defendants argue that Capconvert makes an insufficient effort to keep its claimed trade secrets secret.  See Opp'n at 10–11 (arguing that "the fuller record reflects broad ordinary-course access, a personal-device work environment rather than a controlled company-device fleet, and the absence of separate written post-separation restrictions."), id. at 11 (Additionally, . . . during recruitment, Loewy voluntarily disclosed Rankily details and internal business materials without any NDA or confidentiality agreement.").  But Capconvert limits access to its documents to those who need it for their jobs.  Loewy Decl. ¶¶ 45–46; Ziegler Decl. ¶ 45. It "uses passwords and multifactor authentication to control login access" and "regularly monitors and reviews" the audit trail.  Loewy Decl. ¶ 46; see also id. ("[m]any of the documents Brown took from Capconvert were accessible only to Brown, myself, and . . . Ziegler, not to any other Capconvert employees.").  That Loewy shared the Rankily concept before Brown was an employee is irrelevant, as Capconvert does not contend that the concept of Rankily is itself a trade secret.  See Brown Depo. Tr. at 285:6–8.  And the absence of an NDA or other confidentiality agreement is also irrelevant, as California imposes a duty of loyalty on its employees, which would prevent, for example, the furnishing of client lists to a competitor.  See Erhart v. Bofl Holding, Inc., 387 F. Supp. 3d 1046, 1055 (S.D. Cal. 2019).

Capconvert has therefore sufficiently demonstrated that it possessed trade secrets.

### b.  Misappropriation

Misappropriation is the "acquisition of a trade secret through means that the party knew or should have known were improper, such as theft or breach of a duty to maintain secrecy."  WeRide Corp., 379 F. Supp. 3d at 846.  A plaintiff must establish either (1) acquisition of the secret by improper means, or (2) disclosure or use of the trade secret without consent.  Lamont v. Conner, No. 5:18-cv-4327-EJD, 2019 WL 1369928, at *8

(N.D. Cal. Mar. 26, 2019).

Capconvert alleges that Brown acquired trade secrets by improper means when he copied and shared trade secrets from Capconvert's Google Drive to his Signyl account without authorization in the weeks before he resigned. See App. at 17; Ziegler Decl. ¶¶ 12–16. Brown made copies of and changed the permissions on at least 46 Capconvert files to include his Signyl email address before he left. Ziegler Decl. ¶ 12. Two days before he resigned, he shared 9 documents created by Loewy, including working documents that preceded Brown's tenure at Capconvert. Id. ¶ 13. He also downloaded Capconvert's client list that day. Id. ¶ 16. Capconvert further alleges that Brown used its trade secrets without consent when he used them as AI training inputs to develop Signyl's products. See App. at 17; Ziegler Decl. ¶¶ 34, 40.

Brown responds that he "did not use [Capconvert] materials as prompts, templates, or reference inputs for those Signyl development efforts" and "did not use [Capconvert] internal documents, reports, or notes in Signyl planning or development." See Brown Decl. ISO Opp'n to TRO ¶ 7.[11] One might be inclined to conclude that Capconvert's accusation that Brown used the trade secrets is more plausible than Brown's denial. See Ziegler Decl. ¶ 29 ("[A]ll Signyl documents were created in February 2026 over an approximately two-week period, indicating the entire competing venture was built during that brief period by an individual who had no previous professional experience in software development, machine learning, data science, SEO, GEO, paid media management, or technical marketing."). Brown's admissions in his deposition do support that inclination. See, e.g., Brown Depo. Tr. at 198:13–20 ███████████████ ███████████████████████ 257:15–259:22 (some of Capconvert's data was in Signyl's memory folder for the machine learning (ML) models on his computer), 254:5–13, 256:11–257:14, 291:15–292:24 (Signyl's AI agents have

---

[11] Brown also declares that he "did not copy, clone, or transfer any [Capconvert] proprietary source code repository to [his] personal GitHub account or personal devices," id. ¶ 8 (emphasis added), but this is beside the point.

access to everything in the OpenClaw and Claude memory folders), 257:12–14 (if the AI agents determine that it would be helpful to access the materials to respond to a prompt, they could access those folders). Indeed, why else acquire Capconvert's internal documents if not to use them, and how else could someone with little relevant experience launch a competing company in such a short time?

But the Court need not resolve that disputed fact now. See Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547, 551 (9th Cir. 1986) (district court not bound to decide disputed questions of fact in deciding motion for preliminary injunction); Wright & Miller, Fed. Prac. & Proc. § 2949 (3d ed.) (if there is a factual controversy based on the written record, an evidentiary hearing is the best practice); but see Stanley v. Univ. of S. Cal., 13 F. 3d 1313, (9th Cir. 1994) ("In this circuit, the refusal to hear oral testimony at a preliminary injunction hearing is not an abuse of discretion if the parties have a full opportunity to submit written testimony and to argue the matter."). Brown's denials as to use do not refute Capconvert's accusations of improper acquisition. See Brown Decl. ISO Opp'n to TRO ¶ 7 (re use). Indeed, Brown admitted that he took the materials listed in the audit log. See Brown Depo. Tr. at 54:13–17, 235:20–236:13, 236:22–24, 178:21–24, 184:8–9. His deletion of the copies he made suggests that he knew that his actions were improper. See id. at 203:22–204:1; see also id. at 150:14–21 (Brown agreeing that he "made sure to get the documents" before Capconvert cut off his access). Improper acquisition is enough for misappropriation. See WeRide Corp., 379 F. Supp. 3d at 848 (downloading company files to a personal device can be evidence of trade secret misappropriation); see also Synamedia Americas v. DIRECTV. LLC, No. 24-4967 PSG (KSX), 2024 WL 4867565, at *4 (C.D. Cal. Aug. 26, 2024 (wrongful refusal to return trade secrets after demand for return can constitute threatened misappropriation).

Capconvert has therefore sufficiently demonstrated that Brown misappropriated its trade secrets.

### c.    Actions Threaten Significant Harm

Harm in a misappropriation case can consist of having one's "market position set

back" while the misappropriator "receive[s] an unfair boost." See WeRide Corp., 379 F. Supp. 3d at 853–54. Loewy declares that "it would be immensely harmful should Capconvert's trade secrets become known to its competitors or the general public . . . because Capconvert's competitive advantage lies in the processes, workflows and methodologies that it has developed that allow it to more efficiently and effectively serve its clients and thus price its products more competitively than others." Loewy Decl. ¶ 43. He further declares that "Capconvert operates in a highly competitive market" and that "misappropriation of its trade secrets would be devastating . . . particularly in the hands of someone who already has relationships with many Capconvert clients." Id.; see also Ziegler Decl. ¶ 56 ("Capconvert is a young company operating in a highly competitive market, and its ability to compete is being significantly impeded by Brown and Signyl's use of Capconvert's trade secrets and confidential information to operate a competitor company."). Brown's response that Signyl currently has no "written service agreement with any client and has generated zero income," Brown Decl. ISO Opp'n to TRO ¶ 27; see also Brown Decl. ¶ 77 ("Signyl is pre-revenue. Signyl has zero paying clients."), does not negate the threat of significant harm that Capconvert faces by having its trade secrets in the hands of a competitor, much less one with a live and operational website advertising the same services as Capconvert, see Ziegler Decl. ¶ 25. ███████████████████ ████████████████████████████████ — illustrates the urgency of this threat. ████████████

Capconvert has therefore sufficiently demonstrated that Brown's actions threaten significant harm.

Accordingly, Capconvert is likely to succeed on its trade secrets claims.

### 2. False Advertising Claims[12]

The standards for analyzing FAL and Lanham Act claims are the same. See Quidel Corp. v. Siemens Med. Sols. USA, Inc., No. 16-cv-3059-BAS-AGS, 2019 WL 5320390, at

---

[12] Judge Seeborg did not issue the TRO on the basis of the False Advertising claims.

<div style="text-align: left; font-style: italic;">United States District Court<br>Northern District of California</div>

*3 (S.D. Cal. Oct. 21, 2019). Both require a plaintiff to demonstrate "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997). Capconvert is likely to succeed in meeting this standard.[13]

### a.    Website

The statements on Signyl's website that it has "Deep human expertise across paid media, SEO, GEO, and CRO" and "experience across Google, agencies, and hundreds of brands," and that it has "200+ Brands managed," "$50M+ Ad spend optimized" are plainly false. Signyl has only been operational since early February. See App. at 20–21; Loewy Decl. ¶¶ 37–38. Signyl has no clients, let alone 200+ clients. See Opp'n to TRO at 5 (asserting that Signyl has "no active commercial operations"), 4 ("Signyl has not entered into any written service agreement with any client, has generated zero revenue"); Brown Decl. ¶ 77 ("Signyl is pre-revenue. Signyl has zero paying clients."). Brown's contention that the website claims "did not relate to [his] Capconvert work" but to his "work predating Capconvert" is unpersuasive. See Brown Decl. ¶ 83.[14] A banner that "runs across the front page of the Signyl.agency" making claims about particular experience necessarily suggests that the experience is that of the company whose website it is. Those claims are false, at least as to Signyl.[15]

---

[13] Defendants did not address the false advertising claims at all in opposing the TRO, but did in opposing the preliminary injunction. See Opp'n to TRO; Opp'n at 14–16.

[14] Brown's assertion that there are "credibility concerns" as to "Plaintiff's narrators" is unpersuasive and does not impact the Court's analysis of this issue. See Opp'n at 15–16.

[15] The claims about Signyl's performance metrics might also be false, but the record does not contain enough information to say so, aside from Loewy's statement that the metrics are "dramatically outside the range of believable numbers for even the most successful and established industry players." See Loewy Decl. ¶ 38.

They would also no doubt have a tendency to deceive a substantial segment of visitors to Signyl's website.  See Factory Direct Wholesale, LLC v. iTouchless Housewares & Prods., Inc., 411 F. Supp. 3d 905, 924 (N.D. Cal. 2019) (where statement is literally false, actual deception is presumed).  And Capconvert has sufficiently alleged that those statements are material, as Capconvert explains how its offerings are based on "over 90,000 hours of search marketing services, including SEO, GEO, AEO and Ad Management services to over 250 clients," Loewy Decl. ¶ 5, and that its "competitive advantage lies in the processes, workflows and methodologies that it has developed that allow it to more efficiently and effectively serve its clients," id. ¶ 43; see also Factory Direct Wholesale, 411 F. Supp .3d at 924 (materiality can also be presumed from literal falsity).  Representations of experience across relevant services and with hundreds of brands would likely be material to prospective clients seeking those services.  In addition, there is no dispute that Defendants caused the Signyl website misrepresentations to enter interstate commerce.  See Opp'n (not addressing); see also TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 829 n.3 (9th Cir. 2011) (interstate commerce element "is virtually automatic for websites").  Lastly, the Court concludes that Capconvert is likely to be injured as a result of Signyl's false representations, as Capconvert might suffer "a diversion of sales from itself to" Signyl, a competitor offering the same services.  See Southland Sod Farms, 108 F.3d at 1139.

Accordingly, Capconvert is likely to succeed on the false advertising claims about experience on Signyl's website.

### b.    LinkedIn Page

The statement on Brown's LinkedIn page that he was a "Managing Partner" at Capconvert is false.  Loewy Decl. ¶ 39; Ziegler Decl. ¶ 28.  Brown was a partner, not the Managing Partner.  See Loewy Decl. ¶ 14.  The Court presumes that that statement has a tendency to deceive and is material.  See Factory Direct Wholesale, 411 F. Supp .3d at 924.  Brown also placed the statement into interstate commerce.  See TrafficSchool.com, Inc., 653 F.3d at 829 n.3.  But Capconvert has not yet demonstrated how it is likely to be

United States District Court
Northern District of California

injured as a result of that statement.[16]

Accordingly, Capconvert is likely to succeed on the misappropriation claims, as well as the false advertising claims relating to experience on Signyl's website.

### B.    Irreparable Harm

A party seeking preliminary injunctive relief must "demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22 (emphasis in original); <u>see also</u> <u>Michigan v. U.S. Army Corps of Eng'rs</u>, 667 F.3d 765, 788 (7th Cir. 2011) (harm need not be certain to occur for injunctive relief to issue). The party must show a "sufficient causal connection" between the defendant's conduct and the party's anticipated injury. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." <u>Ariz. Dream Act Coal. v. Brewer</u>, 757 F.3d 1053, 1068 (9th Cir. 2014).

As a result of a 2020 amendment to the Lanham Act, there is a rebuttable presumption of irreparable harm upon a finding of a likelihood of success on the merits of a Lanham Act claim. <u>See</u> 15 U.S.C. § 1116 ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."); <u>see also</u> 5 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 30:47 (5th ed. 2023). Courts have also "presumed irreparable harm when proprietary information is misappropriated." <u>See</u> <u>Albert's Organics, Inc. v. Holzman</u>, 445 F. Supp. 3d 463, 474 (N.D. Cal. 2020).

Capconvert has demonstrated that it is likely to face "an existential threat to its continued operation and existence" in the absence of an injunction. <u>See</u> Ziegler Decl. ¶ 56. Brown does not negate that demonstration by stating that he "has no written service

---

[16] Capconvert was more likely to be harmed by the other false statement on Brown's LinkedIn page, that he worked in Operations for Rankily full-time, <u>see</u> App. at 21; Loewy Decl. ¶¶ 39–40, but Capconvert states that "Brown has now removed Rankily from his profile," Reply at 11.

agreements, no revenue, and has not engaged any [Capconvert] clients for services." Opp'n to TRO at 5 (citing Brown Decl. ISO Opp'n to TRO ¶ 27). Signyl has only been operational for a couple of months; that it has not yet poached any business from Capconvert using Capconvert's trade secrets and confidential/proprietary information or by misrepresenting itself on its website does not mean that Signyl is not likely to cause harm going forward. ██████████████████████████████████████████████████████████████████████████████ A money judgment after the fact[17] will not make Capconvert whole if it loses customers to Signyl. See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

Defendants note that "this case is no longer at the ex parte emergency stage" and that the "parties are already operating under a TRO that . . . includes preservation obligations, a forensic process, expedited discovery, and a stipulated protective-order framework." Opp'n at 16. While the Court appreciates the parties' willingness to jointly propose a temporary restraining order, a temporary restraining order is only temporary. Moreover, Brown's quarantine might have already been breached, see Brown Depo. Tr. at 40:14–24, and the AI agents that Brown still uses for Signyl can continue to access Capconvert's materials if they believe those materials will help with the prompt, id. at 257:12–14. Clearly an injunction remains necessary.

Capconvert has demonstrated that it is likely to suffer irreparable harm absent injunctive relief.

### C.    Balance of Equities and Public Interest

A party seeking injunctive relief must also demonstrate that the balance of equities tips in its favor, and that an injunction is in the public interest. See Winter, 555 U.S. at 20.

---

[17] Also: "Signyl is a one-month old company that appears to have not yet generated any revenue, while Brown has limited financial means," so "any money judgment . . . is highly likely to go unsatisfied." See App. at 23 (citing Just Film, Inc. v. Merchant Servs., Inc., No. C 10-1993 CW, 2011 WL 2433044, at *7 (N.D. Cal. June 13, 2011)).

21

"'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Id. (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

Here, the balance of equities favors enjoining Defendants from using Capconvert's trade secrets, confidential, and proprietary information, and from making misrepresentations about Signyl's experience on its website. See Henry Schein, 191 F. Supp. 3d at 1077 (balance of equities tips in plaintiff's favor where it would do no more than require compliance with federal and state laws); Novation Sols., Inc. v. Issuance Inc., No. 2:23-cv-696-WLH-KSx, 2023 WL 6373871, at *13 (C.D. Cal. Aug. 16, 2023) (no hardship to defendant in being enjoined from making literally false statement). In addition, any harm to Defendants in having to stop using Capconvert's materials and in having to stop misrepresenting themselves is self-inflicted. The Court is therefore unmoved by Defendants' protest that an injunction would be "a preliminary shutdown order." See Opp'n at 17; 2Die4Kourt v. Hillair Cap. Mgmt., LLC, 692 F. App'x 366, 369 (9th Cir. 2017) (holding where infringer complained that "it likely will be forced to shut down," that "when the harm complained of results from a defendant's allegedly infringing conduct, we have nonetheless approved the entry of a preliminary injunction.").[18] "Similarly, the public interest is served when [a] defendant is asked to do no more than abide by trade laws." See Henry Schein, 191 F. Supp. 3d at 1077; see also WeRide Corp., 379 F. Supp. 3d at 854 ("public has a strong interest in protecting intellectual property rights.").

Defendants' argument that the balance of the equities does not tip in Capconvert's favor because the Court has already ordered preservation of the evidence, see Opp'n to TRO at 5, is unpersuasive. Being ordered to preserve evidence is one thing; being ordered not to use the other party's materials and to cease false advertising is another. Defendants' further argument that "[t]here is no public interest in issuing a sweeping, undefined

---

[18] Moreover, Signyl currently has no clients. Even if an injunction amounted to a shut down, just how much would a preliminary injunction shut down?

injunction that a defendant cannot practically comply with because the protected materials have never been identified with reasonable particularity," id. at 6 (citing Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1164–65 (9th Cir. 1998)), id. (arguing that Capconvert refused to identify which information is a trade secret, versus confidential, versus proprietary), also misses the point.  Defendants need not, at this point, understand whether a particular Capconvert document is a trade secret or a confidential document. Defendants may not use either.

Capconvert has demonstrated that the balance of the equities and the public interest favor injunctive relief.

Accordingly, the Court GRANTS the application for a temporary restraining order.

### D.    Bond

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Capconvert is ORDERED to post a nominal bond of $100 within 24 hours.  The Court issues a minimal bond as there is no evidence that Defendants will suffer damages as a result of the injunction.  See Conn. Gen. Life Ins. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003).  The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.  If said bond is not posted by the aforementioned date and time, this Order shall be dissolved.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the motion,  The Court has already entered a preliminary injunction.  See Injunction.

**IT IS SO ORDERED.**

Dated: May 26, 2026

_____

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

23